Good morning, Your Honors. May it please the Court, Rebecca Jones, representing Appellant Robert Tringham. I'd like to reserve three minutes for rebuttal. This morning I'd like to focus on three questions. One, was the substitution of counsel inquiry so deficient that it requires some kind of intervention by this Court? Counsel, I couldn't see what there was to that new counsel thing, except he didn't like the way his lawyer was defending him, and his lawyer wasn't following all his instructions on how to proceed with the defense. Now, maybe Ninth Circuit law is different now, but I always thought you had to ask your client whether he wanted to take it or leave it on a deal that was offered. If your client proposed to plead and take a deal, you had to communicate it to the prosecutor. Your client had the ultimate control over whether to testify or not, but on most of the strategic decisions, as long as the defense lawyer was acting on the basis of some minimal degree of diligence adequate under Strickland, those tactical and strategic decisions were for the lawyer, not the client, and the client wasn't entitled to control them. Am I mistaken under the law as it is now? Oh, no, that's 100 percent correct, but the – what the record – So why wouldn't the judge then be correct in saying no when Tringham wanted a new lawyer because his lawyer wouldn't do what he told her? Because what he asked – what he said is, my lawyer has not adequately investigated and prepared the case. He did not say, she wants to put on defense A and I want to put on defense B. The defendant just went forward and asked what it is that's inadequate, and it seemed like it was just she's not calling this witness, she's not doing that the way I want her to. No, he said she hasn't interviewed witnesses, she hasn't subpoenaed documents, she hasn't made efforts to obtain evidence that I believe is exculpatory, and rather than – my concern about the inquiry here is that there's some cases where the defendant just comes in and says, well, I'm not happy with my lawyer, and the judge says, well, why? And she says, well, she's not putting on the defense the way I want her to. A little like going to a surgeon. You don't tell them where to cut. You tell them whether you accept surgery or not. Correct, but here he said there's a specific list of witnesses I believe that you need to interview. There is a specific piece of evidence I need you to subpoena. I have not been able to – my lawyer told me that she's not an expert in securities fraud, and she was going to hire an expert to work on this. She hasn't done so. And when Judge Otero asked the defense lawyer, what is your response, she just pipes up and says, well, he really wants to be his own lawyer, and he wants to control the litigation. And I think when there are very specific allegations about – That's all she said? She said more words than that. She said more. That was the essence of it. Yeah, she said a lot more about the witness. I mean, you know, he wanted to call some of these people, and it turned out they're really the government witnesses. And ultimately the court, you know, on that second time around, the denial of substitution in January says, court concludes based on review of the documents and the inquiry that Tringham has failed to establish any conflict that would require substitute. And there's no breakdown in attorney-client communications or any ineffective assistance of counsel. Don't we have to credit that absent something else in the record? Well, I think the record is absent, the information necessary to support those conclusions by Judge Otero. And, again, the federal public defender never said, I've gone out and interviewed all the witnesses. I've discussed it with Mr. Tringham. But those witnesses were identified by name? I believe at some point in some of the – yes, in some of the written materials that I've included in the excerpts, yes. Who did they turn out to be, and were they called as witnesses in the trial by your client? Most of them were government witnesses. Right. Right, but that doesn't mean that they didn't have – The others, were they called as defense witnesses by your client? No. At least one was, but then the government threatened him with prosecution, so he invoked his Fifth Amendment – He took the Fifth. Pardon? He took the Fifth. Yes. Okay. Okopian, he's the only one you're talking about. Right. Right. And I believe there was one other person who was mentioned. I can't recall if it was in the reporter's transcript or in one of the written communications. I believe the name was Mark Matisse. That was never – In fact, one of his complaints was that they didn't – she didn't type up his notes or – Well, that complaint – I know, but you're looking at this constellation of complaints, and then three of the witnesses at least testified for the government, I believe. So the judge is looking at this, and we're now going back like archaeologists looking at it, and I'm just having some trouble understanding why this doesn't really fall in the mine run of cases where people challenge, you know, getting a new attorney, and it really is strategic differences on how to approach the case. Again, my point is, well, first of all, just because some of the witnesses that he wanted to have interviewed are government witnesses does not excuse the defense from interviewing them because government witnesses can still have exculpatory evidence for the defense. And you wouldn't know that unless you at least attempt to interview them or you have a strategic reason under Strickland for not attempting to interview the witnesses. I mean, you know, witnesses don't necessarily – Sounds like we'll get a better test of that on habeas. Potentially. When he gets his ineffective assistance petition all cranked up. You know, that's potentially true, Your Honor. All I'm saying is – Except that he represented himself, right? Pardon? Yeah. Big fire, little fire. So what about the continuance? I mean, the jury pool was present. Multiple witnesses had been called from out of state, all of these other things. Why was that an abuse of discretion? Because the case law is fairly clear that if you're going to allow someone to represent himself, you have to give them adequate time to prepare. And when the government had four years to prepare this case with 15,000 pages of documents, and the defense, Mr. Tringham, didn't even have access to an investigator until partway through the trial, he was not given an adequate opportunity to organize his files, to prepare his cross-examination, to access documents and to see, you know, what kind of subpoenas and witness interviews that he put together. Here's what he said, though, on that point. I think your point is a good one. But then what do we make of his statement? He says, well, the witnesses that we didn't get and the witness evidence that we haven't seen, I don't think that it's maybe a deal breaker if I don't get it. That's a real problem. That's kind of a problem in evaluating the continuance, isn't it? It's certainly not helpful. Mr. Tringham, unfortunately, was being his British self and bending over backwards to be very polite during the trial and not making objections and things like that that, you know, really were appropriate. And, yes, I mean, he should have made a better record. There's a lot of places in the States. I mean, he did go to London School of Economics, right? Isn't that where he was? Yes. Yes, he should have. He was pretty articulate here. He was mostly pretty articulate, but he did do a terrible job during the trial of making proffers about prejudice and proffers about any other problems. I mean, I think, you know, the problem here is I think most experienced trial lawyers would say no lawyer would be able to get a case ready for trial, even if he had asked to go pro per on January 27th. Okay? Let's assume he'd made the request the day that Judge Otero denied the very first Marston. I call it a Marston. Look, there's a real problem with last-minute motions to go pro per, and that is that when the trial gets moved it becomes hard to procure the witnesses for the second date. It's – and every judge knows that. Right. So there's a good reason why judges turn down continuances on the eve of trial. There has to be an awfully good reason to grant one. And this guy's reason for granting it seems to be he was an obnoxious client who thought his lawyer should be like a field hand and just do what he's told. And that's the way I'm reading it, and I'm having trouble seeing why the judge wasn't perfectly reasonable. I disagree that he was an obnoxious client. I think there's lots of these cases where the defendants are going back and forth and saying, I don't like my lawyer, and they're not doing this. I believe there's the Robinson case cited by the government where the guy went through two appointed counsel and then hired a guy and then at the very last minute, you know, fired – wanted to fire his retained counsel. You know, we don't have that kind of record here. He just said, I want somebody who's adequately prepared. Judge Otero failed to make an adequate inquiry on the record to show that defense counsel was adequately prepared. And then Mr. Tringham ended up believing that he was going to have to go to trial with somebody who didn't know the case as well as he did. So he decided to go pro per. With Judge McKeown's recitation of what the defendant said about the witnesses in mind, summarize for us the actual damage done to your client's case by the denial of the continuance. What's the damage that occurred as a result of that? It's – I can't. And the reason that I can't is because we don't have an adequate record to show exactly the damage that was done because he was an incarcerated defendant going pro per, having musical investigators during the trial, and we don't know if he had gotten the continuance, what those investigators would have found out, what additional documents out of the 15,000 that he was provided in discovery he could have presented into evidence, what additional questions he could have asked. So the problem here is that the constellation of errors in giving him the support services that he needed. I see why that would prevent the presentation now. Really, lawyers rather than clients ordinarily figure out what would be helpful to the case, and he has a lawyer now. What is there that would have been super helpful to his case, and if only he'd had time to discover? Well, that – it's not part of the record, right?  It's not part of the record, so that's the problem. Like I said, he wasn't making proffers on the record about the additional investigation that could have happened. Sorry? What if you go about it a different way and you say, this is what he was convicted of? Right. What did that evidence look like? It looks like a home-run evidence as it is, but maybe there's something there where there's a weakness in the armor on the conviction. So you're saying, well, we don't know because we don't know, and I'm saying, well, maybe you need to tell us maybe from a different perspective, which is, look, here's what he was convicted of, and this is why those convictions are not really on solid ground. Yeah, you know, I was going to run out and buy some NAPIS funds, but then I discovered I didn't have $100 billion. I think it's $100 million. I thought you were well-paid and that you're a qualified investor as a federal judge. So I made two arguments about the insufficiency of the evidence on the obstruction of justice and the tax evasion charges. I think those are pretty well presented in the briefs. Obviously, that could have been argued better by a more prepared representative of Mr. Tringham, whether it was Mr. Tringham himself or actually an appointed counsel. But, again, I think the problem with trying to demonstrate any prejudice on this record is that when the court's actions prevent somebody from having an experienced attorney representing his case and we have no representations, we have no findings by Judge Etero that this public defender was actually prepared, that she actually interviewed any witnesses, that she had read the discovery, that she was prepared to go to trial, we have no idea what additional type of defense he could have put on had adequate preparation been done. And that's the difficulty with these claims. You know, I wish I could say, yes, I can point to where that's very... I don't mean this as criticism at all, but usually lawyers say, here's what happened and here's what the damage was. I understand. And there's all this stuff that's floating around out there that he couldn't use. And, I mean, it's kind of surprising that you tell us, well, I can't tell you there was any damage. And what I'm trying to say, Judge Trott, is that the problem is that the client didn't... I understand that. ...proffers so that the current trial record doesn't show it. You usually have to show prejudice. And it's not enough to show prejudice to say, I don't know whether there was any. But if you actually... Maybe those documents, all they did was show problematic evidence that was sunk, put your client deeper into the hole. I understand that. And I can't say that that's not a possibility. What I'm trying to say is that when you look at the cases that talk about whether a pro per defendant has a right to have adequate time to prepare for trial, like if you look at Farias... I've never heard a prejudice argument, though, that says, we don't know whether there was any. But if you look at... You have to demonstrate prejudice. You say, I can't. You're in trouble. I understand that that's a problem. But if you look at Farias, which is one of the... It's a slightly different case, right? It's where Judge Burns told the guy, if you want to go pro per, I'm not going to give you any time to prepare. Okay? So then he ended up not... Counsel, it wasn't quite like that. What happened was I was reviewing just now, actually, the colloquy, where the judge asks him, well, what are the problems with the lawyer? What is it that you want to be able to do that the lawyer is not doing? What do you need? More time so you can do it? And whenever the defendant talks, it sounds like double talk. I mean, I'm a judge, too. I'm reading it. It's easier for me than a trial judge because I have more time and I can reread it. And I still can't understand it. I guess, well, con men probably use double talk. I can't understand what it is exactly that specifically, as opposed to generally, this defendant wanted and needed time to get. Tell me, show us where he says something clear in this excerpt. I can't give you a citation from the excerpt right now. I could give you one when I get up from my rebuttal. I know he asked to access the files of his prior counsel that represented him before the federal public defender did. He wanted to issue subpoenas, organize his files, obtain letters of credit. Subpoenas on whom? It sounds like he wanted to subpoena all kinds of people. One of them wouldn't testify. The rest were government witnesses, not people he'd want to subpoena. He might want to cross-examine them, but he could do that. And he wanted them interviewed. The best thing you can do with a witness who's against you is have him not show up when the prosecutor tries to bring him in. Why don't you've exceeded your time. I know. We'll give you some time for rebuttal. You can take a moment to find the specific points that you wanted to raise. We'll hear from the government. Thank you. Good morning, Your Honors. May it please the Court. Carrie O'Neill on behalf of the United States. With the exception of defendant's sufficiency of the evidence arguments, all of defendant's claims on appeal seemingly arise out of his misguided belief in what were likely fraudulent NAPIS bonds. And as the government pointed out in its brief, defendant's belief that he could have repaid his investors once he stole their money and misused it through NAPIS bonds is not actually a defense to his crime. Nonetheless, he was allowed to present that defense during trial. He called the witnesses that he initially identified for the district court, I believe on February 11th. How many witnesses did he subpoena, and how many of the eight witnesses that he said he wanted his lawyer to subpoena wound up being on the stand, either taking the fifth or testifying for the government? Yes, Your Honor. I believe at ER 165, the defendant set course for the district court the witnesses that he wanted to testify on his behalf. Out of those eight, six actually testified. And this goes to the government's prejudice argument in regards to the abuse of discretion for denying the continuance request. So he had listed eight. Those six were subpoenaed by the government and testified for the government? I can't remember. Let's see. The Finbar, okay, so the first person was Gary Noble. The defendant, I'm not sure if he subpoenaed him or not. The second was Edward Okopian, who was summoned into court because the Federal Public Defender's Office and the CJ investigators served subpoenas on behalf of the defendant. The third one, the NAPIS Registrar. The defendant was not able to subpoena or did not bring into court NAPIS Registrar. However, he did bring in the CEO of NAPIS, who was David Spargo, number four on the list. Both Doug Tanney and Annie Chapman were government witnesses that the defendant knew personally, and he thoroughly cross-examined them on the record. The seventh on the list, defendant wanted Tim Hubman, was not hailed into court. I don't know if he was subpoenaed or not. But in his stead, the defendant did summons into court Robert Mitash, who testified based on the proffer here at ER-165 on essentially the same subject matter, which was purchases of NAPIS bonds through a company named Great Eastern. And then the last was the Finbar spokesperson, who the government had, I believe, as its fourth witness in the trial. And again, the defendant thoroughly cross-examined him on securities issues and bond issues. Is there any argument about what it takes to be a NAPIS bond purchaser? I mean, it seems to me that that's so far out of the realm of possibility that it's almost a farce. Your Honor, the government believed it was a farce. It was a red herring at trial. It's a red herring now on appeal. The defendants, and this goes to the district court's decision to deny his request for substitution of counsel and his request for continuance, a three-month continuance on the first day of trial. So what did the expert, Spargo is his name, what did he say about NAPIS bonds and their availability to somebody like this defendant? I believe the testimony in the record was consistent, both from Nigel Gilbert of Max International, from the Finbar spokesperson, as well as, I believe, David Spargo, but I can't recall specifically if he testified to that. But the defendant needed, as Your Honor indicated previously, $100 million. He needed to be some kind of a special investor. A qualified investor. And there was also evidence in the record that there had been individuals who purchased these bonds, and they had been tied up in substantial litigation as a result of them. In fact, the CEO of NAPIS, who defendant hailed into court, was a former professional gambler, and he admitted that as a result of these sales of NAPIS bonds, he had been in litigation. His argument, as I understand it, is really, okay, you're not going to give me the substitution of counsel, so I want a continuance. The court says no. So assuming that it was right on the substitution of counsel, he's got 15,000 pages that maybe his lawyer did or didn't look at, but he hasn't had a chance to look at. Doesn't get the investigator until the trial starts. And then he's got to basically play pick-up ball for the whole trial. And the government, of course, has been preparing for a few years, and you've got all your ducks in order. I mean, why wouldn't a circumstance like this merit some kind of continuance? Yes, Your Honor. So I won't address the substitution inquiry unless the court wants me to, because I do believe that it's clear that it was a strategic difference, and that's essentially how the defendant presented it to the district court. As to the continuance, I think, Your Honor, actually the record shows that the defendant told the district court, and it's at ER 36 and 47, that he had carefully gone through the discovery for the last eight months, week by week. Are you reading what the defendant said or just paraphrasing it? I have carefully in quotes in my notes, I believe the week by week is also his specific phrase, and he said he had gone through the discovery for the last eight months. Whether or not I've stated it in order, I can't say specifically. But that is what he told the district court at that first substitution hearing on January 27th. Moreover, he had also, as Your Honor alluded to, he had also handwritten a chronology of the case and had wanted his defense attorney to type it up. Again, this is a defendant who had been going through the discovery, who had thought through his case, and whose defense counsel told the district court at the substitution hearing that this defendant, and she didn't want to breach the attorney-client privilege, she was very respectful of that, but she said this defendant has taken independent actions, which lead me to believe that he wants to be his own attorney. And so I think the record reflects that the defendant here, although yes, he did not have four years, and he did have substantial discovery to review, had been reviewing the discovery, had been thinking about the defense he wanted to present, which was a NAPIS-centered defense, and was not suddenly given 15,000 documents to review the day before trial. This was a defendant who had already had it essentially in his mind to do this by himself. So what was the defense? You said it's essentially a NAPIS defense. Was there anything besides the NAPIS defense? What else was the defense? Well, as to the specific counts, as Your Honors were discussing previously, and again this goes to the government's prejudice argument and a lack of prejudice, and it's set forth in our brief, his NAPIS defense, which is not a defense because of good faith belief that you can repay the investors after you've wronged them, is not a defense under United States v. Benny. That would have been a defense to counts one through seven, the mail and wire fraud counts. Then there's the tax evasion count, which was count eight. The defendant testified on his own behalf, and he told the jurors that the money, the $2.2 million, that he took from Max International of the victim's money wasn't income for purposes of his tax returns. It was a loan. And he specifically stated, and there's no loan documentation. Oh, no, that fits together. I thought I would be able to pay back what I stole. It's both. It means that's my defense for stealing the money, and that's my defense for not paying taxes on it since I thought I'd be able to pay it back. And it was a loan. Borrowing it. Right, a loan for which there was no documentation. So, again, this goes to sort of the usefulness of the continuance and the lack of prejudice here. Fifteen thousand documents, there would have been no loan documents. No loan documents because he said there were none. That hinged on willfulness, right? That's right, Your Honor. This is a Land Rover house for the girlfriend. Yeah, this is a $1.3 million house, a $50,000 Range Rover. You know, using cashier's checks, converting checks to cash, putting the Range Rover in his girlfriend's name. And, again, this goes to the sufficiency of the evidence argument. There were substantial evidence on the record from which the jury could have drawn the inference that the defendant committed the crime of tax evasion. As for count nine, which is the falsification of the account statement, the defendant did tell the district court that the documents that had been previously stolen from him, allegedly by his former house guest, Gary Noble, which had been stolen, I believe he said, in March of 2009, which is essentially a full year before trial. He said that there was some evidence in those documents that he didn't just completely fabricate this account statement. To make this more concrete, the way I understood this was he got a lot of people to give him what they thought were investments. He spent the money living high, and when he got caught, and he didn't pay taxes on it, and when he got caught, he said he thought he'd be able to make enough money to pay off the investors, and since he was going to pay them off, it was like a loan. Is there more to it? There isn't, Your Honor. And, in fact, in his closing argument, he asked the jurors to give him some more time. Did he invest the money? No, he did not, Your Honor. There were no bond purchases. He just lived really well? He lived well, and he was caught quickly. And the defendant has the temerity to argue now in his reply brief that the government should have waited for him. And I ask, waited for him to do what? Spend more of the victim's money? That's essentially what he's asking for. And we assume that under your obligations under Brady and Kiles v. Whitley that the government went through the 15,000 pages and looked for any evidence of exculpatory information that would have turned it over on discovery? Yes, Your Honor, and the 15,000 pages was turned over. In Wayland's statement, basically the question is, is he representing himself, what, as a licensed securities broker? That's right. The account statement you're asking about? Right. So that's count nine? That's count nine. So what would be the defense to that if you have a piece of paper that says licensed securities broker? Does he have, is there any other document the government turned over that, is at odds with that? There isn't. And, in fact, all the account statements that were turned over were the same as that which the IRS agent had in his possession when he initially questioned Tringham, which said First National Bank Corp. is a licensed securities dealer. Is there anything, and maybe I missed it in reading that transcript, does he ever tell us what the document stolen from him would say so that it would rebut this piece of paper? He does not, Your Honor, and I believe it's in my brief, and I don't have the exact page number from the records, but he didn't testify as to what this other document would say or why, in fact, the jury shouldn't infer that he had fabricated it in response to it. Did he try to bring Gary Noble into court? Your Honor, I don't know if he subpoenaed her or not. I know Gary Noble didn't testify. And I know he had explained to the court in his filings that he had tried to locate him, had tracked him down. Gary Noble said the defendant would have to pay him $1.5 million to get these documents back. It was all very outlandish, and evidence that the defendant thinks he may be able to get at some point isn't enough for this court to find. It was abusive discretion for the district court to deny his request for a continuance. These 15,000 documents that Govrin had, they were all in that CD you gave him eight months before the trial? Your Honor, I wasn't on the case at that time. I think the discovery was produced not all at one time, but throughout the course of the pretrial proceedings. But the defendant, what's in the record is that the defendant told- What was on the CD? A lot of financial documents, Your Honor, bank account statements, witness statements, and the government's interviews of the witnesses, both- The 302s were on the CD? That's correct, Your Honor. What's the record cite to the statement that he allegedly made to the court that he'd carefully gone all through all this stuff? I have it. 36 and 47? 36, 37, but- Yeah, 36 and 47. Do Your Honors have additional questions for me? No. Okay. Ms. Jones? Thank you very much for your indulgence on extra time. Okay. To answer a couple of questions, and then I'll get back to the record cites. The defense to the statement on the document, Licensed Security Broker, is that it was charged as obstruction of justice, so he had to have created it when he knew he was under investigation by the United States. In other words, it's not just simply a false statement proof. It's the timing of it, and the government didn't present any evidence on the timing of when it was created, and I believe there's a possibility that computers would show when documents were created and not created, but those weren't available to him. There was evidence, I believe, that the federal public defender simply tried to locate Gary Noble, but did not actually issue a subpoena to him, and Mr. Tringham was never able to subpoena him. There's evidence in the record, and I apologize. In my excerpts, I didn't write down the page, but 1,000 pages of the discovery were produced in January, right before the trial started, so the 15,000 pages were not produced. It was piecemeal, and I do state in my brief part of the progress of the production of discovery that was documented in the stipulations. What would Noble have said in what was in the 1,000 pages? I don't know what was in the 1,000 pages. There's not a proffer on the record. Noble took the defendant's computers, which, according to Mr. Tringham, contained, and this is at my first volume of the excerpts of record at page 14, bank guarantees, letters of credit, insurance guarantees, and insurance policies that were supposedly that he had obtained to guarantee the investor's money while he was pursuing investment opportunities. He spent the money? I mean, that's pretty bizarre insurance policy, that without investing anything, you would be insured. That's the proffer that I have with the court. At pages 45 and 46, he proffers that he needs to obtain his computers and laptops. At page 169 of my excerpt, he gives the list of witnesses and states that he needs to obtain a securities expert. And at page 15 of the excerpts, he states that he needs to obtain files that were possessed by his prior counsel. I believe it was mistyped, but it said Berner, Nixon. I believe it's Burns and Nixon. So those are the proffers that he made about the additional documents and items that he wanted to obtain and be able to use. Now, the government says in its reply brief, however, the jury could have reasonably concluded that defendant altered the document after his first interview with Special Agent Kersling and showed the document to Kersling during the last interview with the intent of leading him to believe the account statements could not have made the victims believe FNB was a licensed security dealer. Your answer to that is? Without any evidence about when the document was actually created, I don't know that that, I don't believe. Did the defendant show it to Kersling in the first interview? No. But all of a sudden it popped up in the second interview and the defendant was waving it around saying I'm a licensed security dealer. And you're saying that's not enough to infer that it was created in the interim to mislead the agent? Right. Thank you. Thank you very much. I appreciate the additional record sites, and I'd like to thank both counsel for your argument this morning. The case of United States v. Tringham is submitted.
judges: Trott, Kleinfeld, McKeown